IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| GENERAL NUTRITION CORPORATION, | ) |  |
|---|---|---|
|  | ) |  |
|  | ) | 2:08-cv-831 |
| Plaintiff, | ) |  |
| v. | ) |  |
|  | ) |  |
| GARDERE WYNNE SEWELL, LLP., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the MOTION FOR SUMMARY JUDGMENT (Document No. 83) filed by Defendant Gardere Wynne Sewell, LLP ("Gardere") and the MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 87) filed by Plaintiff General Nutrition Corporation.[1] The motions have been thoroughly briefed (Document Nos. 85, 88, 90, 98, 104, 106, 108, 109, 112), and extensive appendices have been provided.[2] The Court heard oral argument on May 27, 2010 and the motions are ripe for disposition.

Factual Background

This is a legal malpractice case. The "GNC" business consists of a family of numerous

---

[1] The acronym "GNC" has been used to describe various distinct corporate entities. The Court will discuss the corporate structure of the GNC family of companies in some detail. The term "GNC" is used when the actual entity is unclear or immaterial.

[2] The parties also filed Concise Statements of Material Fact and responses thereto. Although counsel for both parties have exhibited the highest levels of professionalism in almost all other respects, the Concise Statements of Material Fact have been of only minimal value to the Court, due to the multiplicity of "disputed" contentions. Accordingly, the Court has resorted to an independent review of the underlying documents contained in the appendices.

companies that operate retail stores, and sell vitamins, nutritional supplements and diet products. Plaintiff General Nutrition Corporation is the "operating" company in the family, owns the retail stores, has approximately 14,000 employees, and is the signatory on the retail leases. However, Plaintiff General Nutrition Corporation does not pay any bills or have its own checking account. Deposition of Lisa Davis, Vice President and Corporate Controller ("Davis Deposition") at 39. A separate corporate entity, General Nutrition Incorporated, serves as the "banker" in the GNC family. Two ultimate parent companies, GNC Corporation and General Nutrition Centers, Inc. (collectively, the "Parent Companies"), existed in the GNC family during the 2004-2005 time frame at issue in this lawsuit.[3]

In September 2001, Plaintiff General Nutrition Corporation and Basic Media/Franklin Publications, Inc. ("Franklin") entered into contracts (the "Franklin Contracts") for the production, advertising and targeted delivery of two magazines, *Let's Live* and *Physical*. These publications comprised a large part of GNC's marketing strategy and budget.

In 2003, a private equity investment fund, Apollo Management LP ("Apollo"), acquired 100% of the GNC family of companies for approximately $750 million. Peter Copses, a senior partner at Apollo, was the individual primarily responsible for the acquisition of the GNC family of companies. At the time, sales and profits of GNC were declining, and Apollo's objective was to turn the business around. After the acquisition, Copses was a member of the Boards of Directors of each of the Parent Companies, initially serving as chairman of the Boards.

In June 2004, Louis Mancini, then Chief Executive Officer ("CEO") of the GNC family

---

[3]The Boards of Directors of the Parent Companies were the only boards that actually scheduled and conducted meetings. The Board of Directors of Plaintiff General Nutrition Corporation consisted of only two persons and the Board did not meet during the relevant time period.

of companies, signed agreements to extend the Franklin Contracts through December 2009, at an annual cost of $10-11 million. In November 2004, Mancini was terminated from his position as CEO. Robert DiNicola, whom Copses initially had engaged as a consultant due to his experience in the retail industry and marketing expertise, became interim CEO, Chairman of the Board and Executive Chairman of the Parent Companies. DiNicola did not believe that the Franklin Contracts were the best use of GNC's marketing budget and was concerned that in extending the contracts, Mancini had a potential conflict of interest due to payments his wife had been receiving from the magazines. Accordingly, DiNicola wanted to terminate the Franklin Contracts and pursue an alternate marketing strategy.

Joe Fortunato has been employed by the GNC family of companies for nineteen years and is the current CEO of Plaintiff. During the 2004-2005 time frame, Fortunato was the Chief Operating Officer of Plaintiff. In the fall of 2005, Fortunato became Acting CEO of the GNC Companies and he was officially appointed to that position on November 10, 2005. Fortunato had a prior business relationship with Scott Johnson, the principal officer of Franklin, and he was personally involved in the consideration of whether the Franklin Contracts should be terminated, the efforts to renegotiate those contracts, the actual termination of the contracts, and the ultimate settlement of the Ohio litigation.

CEO DiNicola had worked with the Defendant Gardere law firm since the early 1990s and had a personal and professional relationship with one of its partners, attorney Ronald Gaswirth. In the spring of 2005, DiNicola engaged Gardere to handle certain labor and employment legal matters for the GNC companies. In July 2005, Gaswirth was elected to the corporate officer position of Secretary and hired to serve as Interim General Counsel for all of the

GNC family of companies. Gaswirth contemporaneously retained his role as a partner at Gardere.

In the summer of 2005, Gardere was asked to provide legal advice as to whether the Franklin Contracts were enforceable and whether there was a basis for terminating them. Gardere concluded that it was highly likely that GNC would be found liable for breach of contract if they acted to terminate the contracts. Gardere was then asked to provide legal advice as to the potential damages GNC may face for termination of the contracts. Gaswirth assigned attorney Doug Haloftis, a labor and employment partner at Gardere, to research and opine on these issues.

On August 1, 2005, Haloftis delivered a legal memorandum which was premised on his initial conclusion that the Franklin Contracts were contracts for the sale of "goods," and thus, would be governed by the law of the Uniform Commercial Code (UCC). Haloftis opined that under the UCC, Franklin's recoverable damages for the breach of the contracts would be limited to $1-3 million and that Franklin would be precluded from recovering consequential damages for its lost advertising revenue from third-party advertisers, which was estimated to be approximately $34.5 million. On August 3, 2005, Gaswirth forwarded the Haloftis memorandum to DiNicola and Fortunato, with the accompanying statement: "My advice is tell them we are going to the mattresses (which I already told their lawyer) and see if they blink."

In September 2005, Gardere met with Franklin's lawyers in an attempt to resolve their dispute over the contracts. On October 4, 2005, Franklin provided Gardere with an analysis authored by Douglas Whaley, a Law Professor Emeritus, which assumed, arguendo, that the UCC applied but specifically noted: "It may be that the provision of services outweighs the sales aspects of these contracts and, therefore, the UCC may not be applicable." Upon receipt of

Professor Whaley's analysis, Copses and Fortunato asked Gardere to re-assess the strength of the parties' competing legal positions.

Gardere assigned Camille Penniman, a second-year associate lawyer, to conduct this additional review. Penniman did not revisit or challenge Haloftis' opinion that the UCC would be the applicable law. In addition, Haloftis prepared a second memorandum to respond to the arguments advanced by Professor Whaley. The memoranda were reviewed by attorney Joe Harrison, Gardere's "most senior (grey haired) trial partner." On October 11, 2005, Gaswirth forwarded the memoranda to Fortunato, Copses and DiNicola, among others, and opined that GNC's likelihood of success was in the 85-90% range. The email also noted: "Both Joe and Doug however warn, as all lawyers must, that the termination is not risk free especially when dealing with Judges and juries." On October 19, 2005, Gardere prepared a memorandum for the Board of Directors regarding GNC's potential exposure from repudiation of the Franklin Contracts, and again opined that Franklin would not be entitled to recover consequential damages relating to third-party advertising contracts under the UCC.

On October 20, 2005, there was a joint meeting of the Boards of Directors of the Parent Companies, at which there were presentations by Gaswirth and Copses and a "detailed discussion" regarding termination of the Franklin contracts. As liability was fairly certain, the real question was the quantum of damages Franklin could be entitled to recover. Gaswirth reviewed the legal research, as outlined above, and explained that the high-end risk was $34.5 million, but GNC had only a 20% chance of losing on the consequential damages issue. Copses provided a probable risk analysis, which reflected a certainty of direct damages of $1-4 million plus a 33% chance of losing on the consequential damages issue, for an expected loss value of

5

$10-12 million. Copses started from Gaswirth's opinion, but discounted it as overly optimistic.

The Boards of Directors then unanimously approved the following resolution:

> WHEREAS, the former Chief Executive Officer, Louis Mancini, of GNC Corporation ("Parent") and General Nutrition Centers, Inc. (the "Company"and, together with Parent, the "Companies") purported to execute extension agreements in June 2004 with Franklin Publications for the publication of the *Physical* and *Let's Live* magazines, purporting to extend the contractual relationship with Franklin Publications until December 2009; and
>
> WHEREAS, the Board has determined that it is not in the best interests of the Companies to continue the publishing relationship;
>
> NOW, THEREFORE, BE IT RESOLVED, that the Companies be and hereby are authorized to terminate the publishing relationship and to give notice of same to Franklin Publications.

Thus, even if Copses' risk calculation was based in part upon Gardere's allegedly negligent advice, the fact is that the Boards of Directors determined that a $10-12 million expectation of loss was within an acceptable range.

On October 25, 2005, at Fortunato's direction, Gardere sent a letter to Franklin's attorneys, notifying them that GNC was terminating the Franklin Contracts.[4] The next day, Franklin filed suit against General Nutrition Corporation in Ohio state court, which was removed to federal district court (the "Ohio Litigation"). Gardere defended the Ohio Litigation by contending that the subject contracts involved the sale of goods which were governed by the UCC, and therefore did not entitle Franklin to recover consequential damages for its potential

---

[4] In the first day of his deposition, Fortunato testified that after the Board made the decision to terminate the Franklin Contracts, his involvement was a "moot point" – he reviewed the email but it was up to the lawyers to terminate the agreement. During his later re-convened deposition, Fortunato testified that although the Board had authorized termination, it was ***his*** decision, as Acting CEO, to actually instruct the lawyers to terminate the agreements. Fortunato explained that this was a management decision alone, and he could have disobeyed the Board's resolution, albeit at the risk of being fired.

loss of third-party advertising revenue. In May 2006, the parties filed cross-motions for summary judgment on the damages issue. In June 2007, the parties attended a mediation in an effort to resolve the Ohio Litigation, which was unsuccessful. On July 13, 2007, the Ohio court ruled that the contracts predominantly involved the sale of services, not goods, such that the UCC did not apply to limit Franklin's right to consequential damages. After this adverse development, GNC fired the Gardere law firm, and hired replacement counsel. Upon being advised that there was a high probability of a significant adverse monetary outcome in the Ohio Litigation, Fortunato took the lead in GNC's effort to compromise and settle the case. In early 2008, the parties reached a formal settlement of $12 million.[5]

Thereafter, General Nutrition Incorporated, a corporate member of the GNC family of companies separate and distinct from Plaintiff, made payments of settlement proceeds to Franklin of $9 million in March 2008 and $3 million in March 2009. These settlement payments to Franklin were logged and recorded as inter-company accounting entries. Plaintiff General Nutrition Corporation recorded an inter-company liability to General Nutrition Incorporated for $12 million and corresponding assets of $7,632,000 in goodwill and $4,368,000 in tax-deferred assets. Davis Deposition at 42; Exhibit O. General Nutrition Incorporated recorded an inter-company receivable from General Nutrition Corporation of $12 million. There were no promissory notes or other documents executed between these related corporations regarding this transaction. Davis Deposition at 51-52.

There was no impact on the Income Statement of either General Nutrition Incorporated or Plaintiff General Nutrition Corporation. Davis Deposition at 41. Only a consolidated balance

---

[5]The settlement agreement document has not been made part of the record.

sheet is reported by the GNC family of companies.[6]  A separate balance sheet is prepared monthly for Plaintiff General Nutrition Corporation, which is "rolled up" into the consolidated balance sheet.  Davis Deposition at 44.  The consolidated balance sheet would not reflect the inter-company transaction because the liability on one side and receivable on the other side "would net out against each other."  Davis Deposition at 44.

The offsetting $12 million inter-company liability and receivable accounting entries between General Nutrition Corporation and General Nutrition Incorporated remain on the books of the respective corporate entities.  Davis Deposition at 64.  The GNC family of companies does not establish payment terms on the inter-company amounts and does not typically satisfy them on an individual liability basis.  Davis Deposition at 45.  There is no specific due date for repayment of inter-company liabilities and Davis does not know when it might be paid.  Davis Deposition at 50.  Indeed, Davis cannot say whether the $12 million inter-company liability will ever be paid.  Davis Deposition at 57.  The GNC family of companies does not typically "settle up" inter-company liabilities and receivables with cash payments.  Davis Deposition at 50.  Only one such cash liability repayment has occurred since the start of Davis' employment in 1984.  Davis Deposition at 51.

In March 2007, while the Ohio Litigation was pending, the entire GNC family of companies was sold by Apollo to Ares Corporate Opportunities Fund II, L.P., Ontario Teachers Funds, and other co-investors  ("Ares et al.") for approximately $1.65 billion.  At the time Ares et al. purchased the GNC family of companies, the value/cost of the Ohio Litigation with Franklin had not been determined.  Thereafter, however, the $12 million payment to Franklin

---

[6]Similarly, only a consolidated tax return is filed.  Davis Deposition at 49.

was allocated as part of the $1.65 billion that Ares et al. paid as a lump sum for the entire GNC family of companies. Davis Deposition at 60.

Procedural History

Plaintiff General Nutrition Corporation filed the instant legal malpractice complaint against Gardere in the Court of Common Pleas of Allegheny County, Pennsylvania in May 2008, and asserts claims for negligence, breach of contract, and breach of fiduciary duty. Gardere timely removed the case to this Court.

On July 3, 2008, Gardere filed a Motion to Compel Arbitration based on a provision in the retention agreement between it and "GNC." Plaintiff opposed the motion and in support of its opposition submitted a Declaration from Kenneth Fox, Senior Vice President and Treasurer, which represented that Plaintiff General Nutrition Corporation was a separate and distinct corporate entity from GNC Corporation, which was the entity that had executed the retention agreement with Gardere. In particular, the Fox Declaration stated that there were hundreds of separate entities that use some derivation of the "GNC" brand name but that this case exclusively "involves one of those entities: General Nutrition Corporation." The Declaration also averred that GNC Corporation was not the parent of Plaintiff General Nutrition Corporation, and that GNC Corporation had not received "the legal representation from Gardere that is the subject of this lawsuit." *See* Document No. 12. Plaintiff also opposed Gardere's request to engage in discovery to determine whether General Nutrition Corporation should be bound to the arbitration provision of the retention agreement.

On August 12, 2008, the Court credited Plaintiff's representations and arguments

regarding the distinctions between the respective corporate entities and denied Gardere's Motion to Compel Arbitration. The Court subsequently denied Gardere's Motion to Dismiss Plaintiff's Complaint. The parties engaged in extensive discovery. Cross-motions for summary judgment are now pending.

Legal Analysis

Gardere seeks summary judgment on all counts, for numerous reasons: (1) that GNC terminated the Franklin contracts for business reasons; (2) that Gardere did not breach its duty to render professional legal advice and is protected by the "judgment rule"; (3) that GNC knew and accepted the potential risk of termination and the ultimate payment of $12 million was within the anticipated range; (4) that Gardere's advice was not the "but for" or proximate cause of the termination or alleged damages; (5) that Plaintiff suffered no economic loss because it did not pay the amounts claimed as damages; (6) that GNC actually saved money by repudiating the Franklin Contracts; (7) that the doctrine of *in pari delicto* bars Plaintiff from recovering damages arising out of its conscious decision to repudiate the contracts; (8) that Plaintiff's claims are barred by the statute of limitations; (9) that Plaintiff was not the entity that received legal advice from Gardere and therefore lacks standing; (10) that Plaintiff has not proven any disloyalty, as required to establish a breach of fiduciary duty; (11) that Plaintiff's claim arises under tort law, rather than contract law, because it alleges that Gardere breached its standard of care; and (12) that Plaintiff has elected the theory that Gardere conducted improper research rather than the theory that Gardere failed to present important facts to the Ohio court. Gardere also contends, using an analogy to the "sham affidavit doctrine," that Plaintiff improperly attempted to

10

manufacture material disputes of fact during the reconvened deposition of Joe Fortunato in an effort to avoid summary judgment. Plaintiff seeks partial summary judgment as to three of the affirmative defenses raised by Gardere: (1) regulatory estoppel; (2) alleged violation of a consent order from the Federal Trade Commission; and (3) that recovery is barred by the underlying settlement with Franklin. The Court need not reach most of the parties' contentions, because it concludes that there is a foundational flaw in Plaintiff's case, specifically, that Plaintiff cannot establish that it endured any actual loss or monetary damages.

This diversity case is governed by Pennsylvania law. In *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998), the Pennsylvania Supreme Court recognized that "a legal malpractice action is distinctly different from any other type of lawsuit brought in the Commonwealth." The Court held that an essential element of a legal malpractice claim is that the aggrieved client must show "proof of **actual loss** rather than a breach of a professional duty causing only nominal damages, **speculative** harm or the **threat** of future harm." *Id.* (Emphasis added).

1. "Actual Loss" by Plaintiff General Nutrition Corporation

As an initial matter, assuming *arguendo* that it is the "client," Plaintiff General Nutrition Corporation has not suffered any "actual" monetary loss.[7] It is undisputed that a separate and distinct corporate entity, General Nutrition Incorporated, paid the settlement proceeds to Franklin. It is also undisputed that Plaintiff General Nutrition Corporation has not paid its inter-

---

[7]At the motion to dismiss stage, Defendant argued that Plaintiff had failed to prove "actual harm," as opposed to speculative harm or a risk of future loss, citing *Kituskie*. In its Memorandum Order of September 23, 2008, the Court stated: "While the Court agrees with this legal principle, it concludes that the Complaint adequately alleges actual harm." Thus, Plaintiff has been on notice of this issue since very early in the case.

company liability to General Nutrition Incorporated. Plaintiff General Nutrition Corporation has not paid anything to any entity or person as a result of, or related to, Gardere's advice regarding the Franklin Contracts.

Nor does Gardere's alleged legal malpractice pose a realistic threat of future harm to Plaintiff General Nutrition Corporation. In the GNC family of companies, inter-company liabilities offset each other in the consolidated financial statements and are virtually never "settled up" amongst entities. Indeed, Vice President and Controller Davis could not say whether, when, or if the $12 million inter-company liability would ever be repaid. The Franklin settlement was simply allocated among the lump sum purchase price of $1.65 billion that Ares et al. paid for the entire GNC family of companies. Thus, any threat of a financial loss by Plaintiff General Nutrition Corporation in the future is non-existent or purely speculative.

Plaintiff contends that the facts relating to its loss are "simple," in that "GNC" was sued and "GNC" settled the suit by paying $12 million. Plaintiff's Brief at 38. Unfortunately, as related above, this case is considerably complicated by the undisputed facts. One entity, Plaintiff General Nutrition Corporation, interacted with Franklin and was the signatory on the Franklin Contracts and was the named defendant in the Ohio Litigation; the Boards of Directors of two other entities, GNC Corporation and General Nutrition Centers, Inc., made the decision to authorize termination of the Franklin Contracts; and the actual payment of the settlement proceeds to Franklin was made by a fourth separate entity, General Nutrition Incorporated.[8] Plaintiff has submitted a joint expert report from Mark Gleason and Matthew Hughey, certified

---

[8] The case relied upon by Plaintiff, *Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453, 455-56 (7th Cir. 1994), is clearly distinguishable because the plaintiff corporation had actually paid the $2.6 million rental expense at issue in that case.

public accountants, in support of its contention that the inter-company accounting entries must be given effect. In essence, the expert report explains the various inter-company accounting entries and opines that General Nutrition Corporation suffered a loss and economic harm as a result of the settlement with Franklin. However, the expert report does not contradict, or even address, the testimony of Vice President and Controller Davis that the inter-company liability owed (on paper) by General Nutrition Corporation to General Nutrition Incorporated has not been, and likely never will be, "settled up." Thus, the Court adheres to its conclusion that any "actual loss" to Plaintiff General Nutrition Corporation is non-existent or purely speculative.

2. Plaintiff's Ability to Recover for "Actual Loss" Incurred by Another Entity

The analysis does not end here, however. Plaintiff also asks the Court, in effect, to disregard the corporate formalities and to recognize the economic reality of the $12 million payment by General Nutrition Incorporated.[9] Defendant argues that "[a] plaintiff cannot claim as damages harm that occurred to other entities."

In *Kiehl v. Action Mfg. Co.*, 535 A.2d 571, 574 (Pa. 1987) the Pennsylvania Supreme Court emphasized that under Pennsylvania law, "courts will disregard the corporate entity only in limited circumstances when used to defeat public convenience, justify wrong, protect fraud or defend crime." In *Official Committee of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 352-53 (3d Cir. 2001) (involving the fallout of a Ponzi scheme), the Court of Appeals for

---

[9]General Nutrition Incorporated is not a Plaintiff in this case and was not a party to the Ohio Litigation. It is clear that General Nutrition Incorporated could not have been held liable for the termination of the Franklin Contracts. *Electron Energy Corp. v. Short*, 597 A.2d 175, 178-79 (Pa. Super. 1991) ("It is fundamental contract law that one cannot breach a contract that one is not a party to.")

the Third Circuit predicted that Pennsylvania would not disregard the corporate form in determining whether a particular corporate entity had suffered an injury, noting that Pennsylvania law imposes a "stringent inquiry" which must take care to avoid making the entire theory of the corporate entity useless. The *Lafferty* Court explained that the "legal fiction of corporate existence corresponds with the view that an injury to the corporate body is legally distinct from an injury to another person." *Id.* at 348. In *Kashner v. Geisinger Clinic*, 638 A.2d 980, 984 (Pa. Super. 1994), the Pennsylvania Superior Court held that forgiveness of a patient's medical bills by one entity did not reduce the liability of a related entity, even though they shared a joint trust fund which was used to satisfy judgments against either entity.

The principles underlying the "veil piercing" doctrine apply with even greater force when the party that created the corporate structure asks the court to disregard it. In *Sams v. Redevelopment Authority*, 244 A.2d 779, 781 (Pa. 1968), the Pennsylvania Supreme Court explained that those who create a corporate family structure must live with both the advantages and disadvantages of the corporate form:

> [O]ne cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders') detriment. The advantages and disadvantages of the corporate structure should be seriously considered and evaluated at the time such organization is contemplated and after incorporation has been selected, the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as a corporation for other purposes, whichever suits their present economic interest.

*Id.* In *Kiehl*, the Pennsylvania Supreme Court rejected a corporation's effort to pierce its own corporate veil to avoid workers' compensation liability, citing *Sams*. Although *Kiehl* and *Sams* involved parent-subsidiary relationships, the same analysis has been applied to sister

14

corporations. *Joyce v. Super Fresh Food Markets, Inc.*, 815 F.2d 943, 945-46 (3d Cir. 1987) (reversing district court's conclusion that sister corporations should be treated as single entity to claim workers' compensation immunity).

Courts have also been reluctant to disregard corporate formalities to allow one corporation to recover for amounts owed to related entities. In *Mitchell Company v. Campus*, 2009 WL 1758835 *5 (S.D. Ala. June 17, 2009), the Court explained:

> [A] corporation does not have standing to assert claims belonging to a related or closely affiliated corporation simply because their businesses are intertwined. Even where the directors and officers of one company decided to incorporate a separate company, whatever the motive, they become "bound by the disadvantages as well as the advantages of separate incorporation." Thus, while one company may be merely a shell corporation, wholly controlled by another, "[a] corporation may not pierce the veil of another corporation that it set up for its own benefit in order to advance the claims of that corporation." It is well established that "where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone ... who has a right of recovery, even though in an economic sense[ ] real harm may well be sustained [by other entities as a result] ... of such wrongful acts...." (citations omitted).

*See also Pennsylvania Engineering Corp. v. Islip Resource Recovery Agency,* 710 F.Supp. 456, 465 (E.D.N.Y. 1989) ("Courts will not allow a parent corporation to pierce the corporate veil it set up for its own benefit in order to advance the claims of its subsidiary."); *North Carolina ex rel. Long v. Alexander & Alexander Services, Inc.*, 711 F. Supp. 257, 264-65 (E.D.N.C. 1989) (parent corporation could not recover for amounts owed to wholly-owned subsidiary). In *Nunn v. Chemical Waste Mgt., Inc.*, 856 F.2d 1464, 1470 (10th Cir. 1988) (barring parent corporation from recovering lost profits of separate corporate entity), the Court of Appeals for the Tenth Circuit stated: "As a matter of law, it was erroneous for the trial court to disregard the separate entity status of the defendant corporations and the injured corporation."

15

In *Barium Steel Corp. v. Wiley*, 108 A.2d 336 (Pa. 1954), an evenly-divided Pennsylvania Supreme Court considered whether a parent company could recover under a breach of contract theory for a tax deficiency paid by a subsidiary. The defendant argued that the parent company suffered no loss or damages, and therefore, could not recover. *Id*. at 341. The three justices in "dissent" opined that the parent corporation must establish that it suffered damages from the breach in its own right before it could recover, and that the court would not disregard the separate corporate forms by treating the amounts paid by the subsidiary as an expense of the parent. *Id.* at 347. The three justices in the prevailing opinion acknowledged the lack of clarity as to when the corporate veil may be pierced, but held that under the facts and circumstances of that case, the parent corporation had been damaged and could seek to recover. *Id.* at 341. Given the subsequent developments in Pennsylvania law in *Sams* and *Kiehl*, it is the "dissent" in *Barium Steel* that is now entitled to greater weight. To summarize, under Pennsylvania law, courts must be reluctant to disregard corporate formalities by allowing one corporation to recover for actual loss suffered by a distinct and separate corporate entity.

Plaintiff's request that the Court ignore corporate formalities rings particularly hollow under the facts and circumstances of this case. It was ***Plaintiff*** who strongly asserted the reality of corporate formalities to defeat Gardere's Motion to Compel Arbitration and stated that this litigation involved only "one" GNC entity: "General Nutrition Corporation." Based on the evidentiary record developed during discovery, it now appears that at least two of the representations made by Plaintiff in the Fox Declaration response were less than forthcomingly accurate: (1) GNC Corporation ***is*** the ultimate parent corporation of Plaintiff; and (2) the GNC Corporation Board of Directors ***did*** receive legal advice from Gardere regarding termination of

the Franklin Contracts which are the subject-matter of this lawsuit. Indeed, the Boards of Directors of the Parent Companies authorized the termination of the contracts. The $12 million settlement payment was reflected on the consolidated financial statement for the GNC family of companies, and it certainly appears that the GNC family of companies was operated as a single entity. And now, having previously advocated (successfully), that the corporate distinctions between GNC Corporation and General Nutrition Corporation should be given full force and effect, Plaintiff is disadvantaged to seek the Court's indulgence to ignore such corporate distinctions now. *See, e.g., G-I Holdings, Inc. v. Reliance Ins. Co.,* 586 F.3d 247, 261 (3d Cir.2009) (doctrine of judicial estoppel "bar[s] a party from taking contradictory positions during the course of litigation.").[10] As the Pennsylvania Supreme Court explained in *Sams*, a party cannot expect a court to treat it as a corporation for some purposes, and to disregard the corporate form for other purposes, "whichever suits their present economic interest."

Application of the veil-piercing doctrine may at times lead to results which may appear to be harsh. For example, in *Garcia v. Adventure Knits, Inc.*, 1989 WL 16250 (E.D. Pa. 1989), *aff'd* 887 F.2d 261 (3d Cir. 1989), the Court overturned a jury verdict in favor of an injured worker and refused to pierce the corporate veil to hold the parent corporation liable even though the subsidiary corporation was inactive and could not satisfy the judgment. In *Anesthesiologists Associates of Ogden v. St. Benedict's Hospital*, 884 P.2d 1236 (Utah 1994), the Court held that one of the disadvantages of the corporate form was that the corporation could not recover for

---

[10]To be clear, the Court has not found nor implies that Plaintiff has acted in bad faith and is not applying the doctrine of "judicial estoppel" as advocated by defense counsel at oral argument. Rather, the doctrine is cited as illustrative of the disfavor with which courts view contradictory attempts to secure the benefits of the corporate form while at the same time seeking to avoid the disadvantages of same.

17

losses suffered by individual doctors. The Court rejected the argument that this result was inequitable, stating: "if any inequity results from this decision, it will have been caused by the employee shareholders' lack of foresight in the structuring of their business." *Id.* at 1241. In *Joyce*, the Court of Appeals for the Third Circuit faced a similar situation involving a request to disregard a complex corporate structure and observed:

> Nor can we say that leaving the corporate veil intact would work any injustice. [Defendant] chose to construct a complex corporate family structure. . . . This structure has afforded the [Defendant] family various tax and labor advantages. . . . While we certainly do not begrudge the [Defendant] family these fruits, we will not sympathetically listen as they complain of the other consequences. Piercing the corporate veil is appropriate when "the court must prevent fraud, illegality or injustice or when recognition of the corporate entity would defeat public policy...." Here, we see no reason to raze the walls which [Defendant] so carefully built.

815 F.2d at 946 (citations omitted). A similar result is applicable here. The decisions of how to structure the GNC family of companies, how to authorize and pay for the settlement with Franklin, how to account for and "settle up" the inter-corporate liabilities, and how to pursue this lawsuit were fully within GNC's control. The Court will not disregard the corporate structure that the GNC family created.

In conclusion, the Plaintiff corporate entity, General Nutrition Corporation, has not suffered any "actual loss" itself and under Pennsylvania law, it may not pursue a legal malpractice claim for an actual loss incurred by a separate and distinct corporate entity. Accordingly, Defendant Gardere's Motion for Summary Judgment will be GRANTED and the Motion for Partial Summary Judgment of Plaintiff General Nutrition Corporation will be DENIED AS MOOT.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GENERAL NUTRITION CORPORATION, | ) ) ) |
| Plaintiff, | ) 2:08-cv-831 ) |
| v. | ) ) |
| GARDERE WYNNE SEWELL, LLP., | ) ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this 21st day of July, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the MOTION FOR SUMMARY JUDGMENT (Document No. 83) filed by Defendant Gardere Wynne Sewell, LLP is **GRANTED** and the MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 87) filed by Plaintiff General Nutrition Corporation is **DENIED AS MOOT**.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:	Dennis St. John Mulvihill, Esquire
Email: dmulvihill@rlmlawfirm.com
Thomas J. Farnan, Esquire
Email: tfarnan@rlmlawfirm.com
Erin J. Fucci, Esquire
Email: efucci@rlmlawfirm.com
David L. Haber, Esquire
Email: dlh@wshpc.com
Amy J. Coco, Esquire
Email: AJC@WSHPC.COM
James R. Schadel, Esquire
Email: JRS@WSHPC.COM

Scott P. Cooper
Proskauer Rose LLP
Email: scooper@proskauer.com